UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

KATHERINE RUTLEDGE

        Plaintiff,

v.                                Civil Action No. 2:05-0936

LIFE AND ACCIDENTAL DEATH &
DISMEMBERMENT PLAN, a Tennessee
Employee Benefit Plan, and
HOSPITAL CORPORATION OF AMERICA,
a Tennessee corporation, and
HCA MANAGEMENT COMPANY, INC.,
a Tennessee corporation, and
UNUM PROVIDENT CORPORATION,
a Tennessee corporation, and
UNUM LIFE INSURANCE COMPANY OF AMERICA,
a Tennessee corporation, and
DOES 1 THROUGH 10, inclusive,

        Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

        Pending are motions for summary judgment by defendants

Life and Accidental Death & Dismemberment Plan, HCA Inc.

(misidentified in the Complaint as Hospital Corporation of

America and HCA Management Company, Inc.), UnumProvident

Corporation, and Unum Life Insurance of America and plaintiff

Katherine Rutledge, filed respectively on July 14 and July 17,

2006.[1]

_____

      [1] Plaintiff consents to dismissal of Count II, a claim for
equitable relief under 29 U.S.C. § 502(a)(3).  The plaintiff also
consents to dismissal of HCA Inc. affiliates, Hospital
Corporation of America and HCA Management Company, based on the
representation that "[n]o HCA entity played any role in the

I.


       Rutledge is a former employee of Teays Valley Health

Services, Inc. at Putnam General Hospital. (Jt. Stip. ¶ 4).  HCA

Inc. adopted an employee benefit plan entitled Life and

Accidental Death & Dismemberment Plan ("Plan").  (Id. ¶ 2).  Unum

Life Insurance Company of America ("Unum") insured benefits and

administered claims for benefits under the Plan. (Id. ¶ 3).

Rutledge was a participant in the Plan, an entity which qualifies

as an employee benefit plan under the Employee Retirement Income

Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. (Id. ¶¶

2, 4).  In the factual discussion that follows, the court will

examine (1) Rutledge's medical history as it appears in the

administrative record, (2) the relevant Plan provisions, and (3)

the procedural history of Rutledge's claim and this action.


A.   Rutledge's Medical History Within the Administrative Record


       On May 19, 2003, Rutledge's left leg was amputated

_____

decision to deny Plaintiff's claim and none is responsible for
funding any benefit that may be payable to the Plaintiff . . . "
(Pl.'s Not. of Non Opposition to Specific Portions of the MSJ).
The court, accordingly, ORDERS that Count II and the named HCA
Inc. affiliates be, and they hereby are, dismissed.

below the knee. (Pl.'s Mot. at 5).  The medical records indicate
that the loss of Rutledge's left leg in May 2003 was preceded by
many years of treatment for various conditions dating back to an
injury sustained when she was a child.  (Admin. Rec. at
UACL00467)(hereinafter "AR at _____").  A consultation report
dated May 21, 2002, for example, noted a history of an ulceration
to her left ankle that had been present for a long time, and that
Rutledge had been "involved in an accident and had multiple
surgeries to the ankle area." (Id. at UACL00540).  In December
2002, it was noted that plaintiff "had chronic infection in the
foot and lateral side of the ankle since then" and "multiple
flare ups with opening of the wound and drainage." (Id. at
UACL00425).  During the period of December 2002 to May 2003,
Rutledge was treated a number of times and, in March 2003
underwent ankle surgery, which resulted from "a longstanding
process of severe infection." (Id. at UACL00710).

        Rutledge underwent the amputation on her left leg after
failing conservative management with intravenous antibiotic
therapy. (Id. at UACL00590).  On May 18, 2003, her admitting
diagnosis was osteomyelitis. (Id. at UACL00465).  However, after
amputation, the final diagnosis was "[d]istal skin, soft tissues
and bone showing extensive ischemic necrosis with focal acute

3

cellulitis in the areas of ulceration; osteomyelitis [wa]s not seen." (<u>Id.</u>)

Beginning in mid-June 2003, Rutledge was treated for pain and swelling in her right ankle and foot. (<u>Id.</u> at UACL00411).  In July, she was again admitted to Putnam General with "probable embolism right foot." (<u>Id.</u> at UACL00551).  At that time, the right foot was cold and cyanotic.  (<u>Id.</u> at UACL00394).  Rutledge was then transferred to St. Mary's Hospital for treatment. (<u>Id.</u> at UACL00389-388).

On July 19, 2003, she was admitted to St. Mary's Hospital for eleven days. (<u>Id.</u> at UCAL00988).  While at St. Mary's, her treatment included "emergent angioplasty" and stenting of the right "external iliac." (<u>Id.</u> at UCAL00389-388). According to Rutledge's discharge summary:

> "During her stay [in the hospital], she had worsening cyanosis of her right toes and foot with decreasing pulse.  Her Doppler examination showed dopplerable posterior libialis; however, she lost the dorsalis pedis pulsation.  Dr. Shook saw the patient from the podiatry standpoint and recommended amputation [of the right leg below the knee]."

(<u>Id.</u>)

On August 1, 2003, Dr. John King amputated Rutledge's right leg at Putnam General Hospital.  (Pl.'s Mot. at 6).  The

4

right leg was amputated "for arterial occlusion secondary to antiphospholipid syndrome." (AR at UACL01002).  According to the plaintiff, questions have arisen regarding the necessity of the second amputation "in light of the finding of no osteomyelitis and Dr. King's reputation." (Pl.'s Mot. at 6).

B.   The Relevant Plan Provisions

     Rutledge alleges that she is entitled to benefits under the Plan.[2]  The Plan pays specified benefits upon proof of the occurrence of a "covered loss," which includes losses of limbs that result from an "accidental bodily injury . . . within 365 days from the date of the accident." (AR at UASP10050).  An "accidental bodily injury" for this purpose "means bodily harm caused solely by external, violent and accidental means and not contributed to by any other cause." (Id. at UASP10062).  Under the Plan, covered losses include "one foot" or "both feet." (Id. at UASP10050).  The Plan does not cover accidental losses "caused by, contributed to by, or resulting from . . . disease of the body . . ." (Id. at UASP10053).

_____

     [2] A complete copy of the Plan can be found in the administrative record at UASP10001-USAP10068.

5

The Plan provides, "When making a benefit determination under this Summary of Benefits, Unum has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the Summary of Benefits." (AR at UASP10026).

C.    Procedural History of the Claim and this Action

On June 4, 2003, following the amputation on her left leg, Rutledge telephoned Unum to inquire about accidental dismemberment benefits.  (Id. at UACL00787).  The Unum representative, Kellie Greenleaf, recorded some information and the claim was entered into the system. (Id.) A few days later, on June 10, 2003, Ms. Greenleaf issued an acknowledgment letter and claim form. (Id.)  On June 11, 2003, Ms. Greenleaf sent the acknowledgment letter, a records authorization form and a statement of medical treatment. (Id. at UACL00784).

On June 16, 2003, Rutledge called Unum for help in completing the dismemberment form. (Id. at UACL00786).  Rutledge explained that the accident that resulted in the amputation had occurred when she was eight years old and asked if Unum needed information relating to that accident. (Id.)  Unum's

6

representative returned the call later that day and recorded the

following:

> She [Rutledge] explained the accident leading to her
> loss happened 30 years ago when she was hit by a car.
> She had developed infections through the years and now
> has had her leg amputated.  I explained the policy
> requires the accident occur while you are insured under
> the plan and the loss has to occur within 365 days of
> [the] accident.  None of these conditions have been
> met.  She didn't realize this was an "accidental"
> coverage and agreed we would withdraw dismemberment
> claim.

(Id.)  Rutledge confirms that she became discouraged and withdrew

her claim. (Pl.'s Mot. at 7).  Unum memorialized the conversation

with Rutledge in a letter dated June 17, 2003, which explained

why the loss was not covered under the Plan. (AR at UCAL00788).

The letter further stated, "If at any time you wish me to resume

my review or you wish me to send you a formal declination of

coverage, I would be glad to do so." (Id.)

By a letter to Unum dated July 10, 2003, Rutledge's

attorney, Jason Stemple, stated that it was not correct that the

accident that caused Rutledge's left leg amputation occurred

thirty years ago.  (Id. at UCAL00803).  In a telephone

conversation on July 14 2003, her counsel explained that she had

fallen out of a pick-up truck in December 2002.  (Id. at

UACL00802) The relevant medical report, which was received by

Unum later, explained: "She injured her foot when she twisted getting out of a truck yesterday 12/16/02.  This was her left foot and ankle; she has a long history of problems here; she initially injured it as a teenager . . . she has had chronic infection in foot and lateral side by the ankle since then." (Id. At UACL00425).

On September 17, 2003, Rutledge's attorney informed Unum that Rutledge had "suffered another setback.  While receiving treatment for her amputation of her left leg, Ms. Rutledge experienced a stroke or some other medical problem, which caused the loss of her right leg." (Id. at UACL00806).  As a result, "Katherine Rutledge is now making a claim for the loss of both legs under her disability policy provided by her employer."  (Id.)  The benefit payable to Rutledge upon proof of a covered loss of both legs is $125,000. (Id. at UACL01044).  On September 23, 2003, Ms. Greenleaf wrote Mr. Stemple by email to acknowledge receipt of the September 17, 2003 letter and stated: "I need 30 years of past medical history on Kathy [Rutledge]. . ." (Id. at UACL00807).

On October 3, 2003, Mr. Stemple responded to Ms. Greenleaf by letter.  He forwarded the few medical records in his possession and reminded Unum that he had previously sent an

executed medical records release. (<u>Id.</u> at UACL00808).
Subsequently, on October 8, 2003, Mr. Stemple sent Unum a list of
Rutledge's medical providers and indicated that she would sign
another medical authorization.  (<u>Id.</u> at UACL00820).  Two days
later Ms. Greenleaf sent Mr. Stemple an email indicating that the
claim had been reopened and a claim number had been established.
(<u>Id.</u> at UCAL00811).

      After Unum requested another medical records release,
on October 29, 2003, Mr. Stemple forwarded the second medical
records release and a list of Rutledge's medical providers to Ms.
Greenleaf at Unum to prevent further delay.  (<u>Id.</u> at UACL00823).
On November 14, 2003, Ms. Greenleaf wrote to Mr. Stemple and
informed him of the claim status: "At this time, I am waiting for
medical records."  (<u>Id.</u> at UACL00817).  However, Ms. Greenleaf
had only begun to retrieve medical records that day. (<u>Id.</u> at
UACL00815).  Unum's request was further delayed until December 1,
2003 and the request had to be resubmitted.  (<u>Id.</u> at UACL00825-
824).  On December 22, 2003, Ms. Greenleaf sent a letter to Mr.
Stemple saying she was still waiting for medical records.  (<u>Id.</u>
at UACL00828).

      In February 2004, Mr. Stemple wrote to Ms. Greenleaf
requesting a status update of Rutledge's benefits. (<u>Id.</u> at

9

UACL00835).  After receiving the letter on February 26, 2004,
nurse Donna M. Boissoneault, an employee of Unum, signed a
Consulting Referral Review form that same day.  (Id. at
UACL00831).  On the form in response to the direct question:
"Were there any other significant contributing factors that
played a role?" she opined: "The records do report an injury to
her left foot, 'when she twisted it getting off a truck yesterday
12/6/2002.'" (Id. at UACL00832).  She further stated, "The
records available are insufficient to determine what extent
disease and/or chronic osteomyelitis may have contributed to the
loss of both legs."  (Id. at UACL00831).  Nurse Boissoneault
wrote she needed to review medical records from Drs. Duffy,
Fichter, Cox, King, Putnam General Emergency, Outpatient and
Admissions records, and St. Mary's.  (Id.)

        Following Nurse Boissoneault's review, some, but not
all, of the records were requested.  (Id. at UACL00844-840).  On
March 24, 2004, Ms. Greenleaf once again informed Mr. Stemple
that she was waiting on medical records.  (Id. at UACL00858).
Mr. Stemple responded by expressing his frustration with the
continuing delay. (Id. at UACL00861).

        On April 21, 2004, the claim was assigned to a
different claims representative, Tracey Mowatt.  (Id. at

UACL00863).  A week later, Ms. Mowatt requested an updated medical release be signed because Unum had delayed greater than 90 days in obtaining the medical records from St. Mary's.  (Id. at UACL00870).  On June 25, 2004, Ms. Mowatt wrote that the records were received and it would take a minimum of 15 business days to review the claim.  (Id. at UAL00874).

Rutledge's medical records were reviewed by an Unum on-site registered nurse ("RN"), who concluded as follows:

> Based on the available medical records . . . antiphospholipid antibody syndrome, a hypercoaguable disorder and disease of the body, caused recurrent arterial thrombosis resulting in below knee amputation of right leg on August 1, 2003; and was also a contributing cause of the left below knee amputation on May 18, 2003.

(Id. at UACL00942).  An on-site forensic pathologist reviewed the RN's analysis, discussed it at length, and agreed with the conclusion reflected in the RN's report. (Id.)

Based on these analyses and opinions, Unum denied Rutledge's claim for dismemberment benefits by a letter dated August 6, 2004. (Id. at UACL00953-951).  After reviewing the policy language regarding covered and excluded losses described above, the denial letter stated:

> Mrs. Rutledge's loss was contributed to by antiphospholipid antibody syndrome, a hypercoagulable disorder and disease of the body.  This caused

11

recurrent arterial thrombosis resulting in below the
knee amputation of the right leg on August 1, 2003.
Thus, Mrs. Rutledge's loss is not a covered loss under
the policy because the loss was not due to bodily harm
caused solely by external, violent and accidental means
not contributed to by any other cause as the above
policy language requires.

Even if Mrs. Rutledge's loss could be seen as due to
bodily harm caused solely by external, violent and
accidental means not contributed to by any other cause
as stated in the policy, the loss is excluded from
coverage for the following reasons.

The policy, specifically excludes coverage for losses
caused by, contributed to by, or resulting from disease
of the body.  The below the knee amputation of her left
and right leg was caused by antiphospholipid antibody
syndrome, a hypercoagulable disorder causing recurrent
arterial thrombosis; which is considered to be a
disease of the body.  Therefore benefits for this claim
are not payable.

(Id. at UACL00951).  Rutledge was advised of her appeal rights

and the right to submit "written comments, documents, records or

other information in support of [her] appeal." (Id.)

        Rutledge contends that the delay in issuing the denial

letter was well in excess of the 60 days allowed by ERISA.

(Pl.'s Mot. at 11-12).  The Plan states that Unum will give

notice of its decision regarding a claim based on disability "no

later than 45 days after the claim is filed." (AR at UACL00884)

The 45 day "time period may be extended twice by 30 days." (Id.)

At no time did Unum notify the claimant that "an extension is

necessary due to circumstances beyond [its] control . . . and the

12

date by which Unum expects to render a decision" as required by
the Plan. (<u>Id.</u>)  Rutledge maintains her family was devastated by
astronomical medical bills, depression and severe emotional
distress during the delay. (<u>See</u> <u>Id.</u> at UACL00860).  Rutledge does
not, however, state a separate claim for relief for this putative
ERISA violation.

Rutledge, by counsel, appealed the denial of her claim
by letter dated March 14, 2005. (<u>Id.</u> at UACL01033).  During the
appeal, it was discovered that Unum had not obtained the Putnam
General Hospital Emergency Room records as requested by Nurse
Boissoneault in the nurse's February 26, 2003 Consulting Referral
Review form. (Pl.'s Mot. at 12; AR at UACL00831).  Counsel for
Rutledge obtained and submitted the medical records and a video
statement of Rutledge and her family describing how Rutlege's
disability has affected them.[3]  (AR at UCAL01033).  The medical
records included reports related to the December 2002
hospitalization and recent office visits showing continuing
treatment relating to the amputations.  (<u>Id.</u>; Def.'s Mot. at 6).

The supplemental medical records were then analyzed by
the on-site forensic pathologist who had previously reviewed the

_____

[3] A copy of this video is included in the administrative
record.

13

medical information. (Def.'s Mot. at 6).  On March 28, 2005, she

informed Unum's Appeals Consultant that the newly submitted

medical data "does not alter the previous medical opinion.  The

records indicate that the condition was caused by, contributed to

by or resulting in a disease of the body and the injury was not

solely caused by external, violent or accidental means." (AR at

UACL01034).

By letter dated April 1, 2005, Unum upheld the denial

of Rutledge's claim. (Id. at UACL01037-1035).  The appeal denial

letter again reviewed the relevant policy language, summarized

the medical information, and described the results of the medical

evaluations that had been conducted. (Id.)  Unum then concluded

as follows:

> Your appeal did not include any additional information
> regarding the claim for Accidental Dismemberment
> benefits.  The additional records that you submitted as
> of the time that the injury occurred in December 2002
> did not provide any new evidence that would indicate
> that the condition was not caused by, contributed to by
> or resulting from a disease of the body.  The medical
> history clearly shows that your client had problems
> with her left leg for a number of years up to and after
> the alleged accident in December 2002 that was reported
> to be the reasons for the amputations. As the policy
> specifies, to be considered an accident, the injury had
> to be caused solely by external, violent and accidental
> means and not contributed to by any other cause.  As
> noted, the medical evidence shows that the condition of
> antiphospholipid antibody syndrome, a hypercoguable
> [sic] disorder and a disease of the body caused
> recurrent arterial thrombosis resulting in below knee

14

amputation of the right leg on August 1, 2003; and was
also a contributing cause of the left below the knee
amputation in May 2003.  As a result, the denial was
appropriate and is being upheld.

(<u>Id.</u> at UACL01036-1035).

On November 28, 2005, Rutledge instituted this action.
Rutledge alleges she "is dismembered as defined by the Plan and
due benefits which the Defendants have refused to pay." (Compl. ¶
22).

II.

A.   Standard of Review

The standard of review for a decision made by an
administrator of an ERISA benefit plan generally is <u>de novo</u>.
<u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989);
<u>Bynum v. Cigna Healthcare of North Carolina, Inc.</u>, 287 F.3d 305,
311 (4th Cir. 2002); <u>Richards v. UMWA Health & Retirement Fund</u>,
895 F.2d 133, 135 (4th Cir. 1989); <u>de Nobel v. Vitro Corp.</u>, 885
F.2d 1180, 1186 (4th Cir. 1989).  Where the plan gives the
administrator discretion to determine benefit eligibility or to
construe plan terms, however, the standard of review is whether
the administrator abused its discretion.  <u>Firestone</u>, 489 U.S. at

15

111; <u>Stup v. Unum Life Ins. Co. of Am.</u>, 390 F.3d 301, 307

(4th Cir. 2004); <u>Bynum</u>, 287 F.3d at 311.

      Under this standard, a plan administrator's decision

will not be disturbed if it is reasonable, even if the reviewing

court would have come to a different conclusion independently.

<u>See</u> <u>Smith v. Continental Cas. Co.</u>, 369 F.3d 412, 417 (4th Cir.

2004); <u>Feder v. Paul Revere Life Ins. Co.</u>, 228 F.3d 518, 522 (4th

Cir. 2000). "[A] decision is reasonable if it is the result of a

deliberate, principled reasoning process and if it is supported

by substantial evidence." <u>Ellis v. Metropolitan Life Ins. Co.</u>,

126 F.3d 228, 232 (4th Cir. 1997) (internal quotation marks

omitted).

      Where a plan gives discretion to an administrator or

fiduciary who is operating under a conflict of interest, however,

a reviewing court must also weigh that conflict "in determining

whether there [has been] an abuse of discretion." <u>Firestone</u>, 489

U.S. at 115; <u>see</u> <u>Booth v. Wal-Mart Stores, Inc. Assocs. Health &</u>

<u>Welfare Plan</u>, 201 F.3d 335, 342 (4th Cir. 2000). A court then

reduces the amount of deference accorded the administrator's

decision and determines, based on review of the record before the

administrator at the time of its decision, whether the outcome is

consistent with one that might have been made by an administrator

acting free of the interests that conflict with those of the
participants and beneficiaries.  See Ellis, 126 F.3d at 233
("[I]n no case does the court deviate from the abuse of
discretion standard. Instead, the court modifies that abuse of
discretion standard according to a sliding scale.  The more
incentive for the administrator . . . to benefit itself by a
certain interpretation of benefit eligibility or other plan
terms, the more objectively reasonable the administrator['s] . .
. decision must be and the more substantial the evidence must be
to support it.").

     In sum, "the greater the 'incentive for the [plan]
administrator . . . to benefit itself by a certain interpretation
of benefit eligibility . . . , the more objectively reasonable
the administrator['s] . . . decision must be and the more
substantial the evidence must be to support it." Bynum, 287 F.3d
at 311 (quoting Ellis v. Metro. Life Ins. Co., 126 F.3d 228, 234
(4th Cir. 1997)).  The court is called upon in such a situation
to "lessen the deference normally given under this standard of
review . . . to the extent necessary to counteract any influence
unduly resulting from the conflict."  Bynum, 287 F.3d at 312
(quoting Ellis, 126 F.3d at 233).

     Beyond these considerations for setting the applicable
standard of review, the court of appeals in Booth provided

17

guidance on how to conduct an inquiry concerning the

reasonableness of an administrator's decision.  The court of

appeals assembled the following multi-factor test, which

includes:

> (1) the language of the plan; (2) the purposes and
> goals of the plan; (3) the adequacy of the materials
> considered to make the decision and the degree to which
> they support it; (4) whether the fiduciary's
> interpretation was consistent with other provisions in
> the plan and with earlier interpretations of the plan;
> (5) whether the decisionmaking process was reasoned and
> principled; (6) whether the decision was consistent
> with the procedural and substantive requirements of
> ERISA; (7) any external standard relevant to the
> exercise of discretion; and (8) the fiduciary's motives
> and any conflict of interest it may have.

Booth, 201 F.3d at 342-43; Johannssen v. District No. 1-Pacific

Coast Dist., MEBA Pension Plan, 292 F.3d 159, 176 (4th Cir.

2002); see also Lockhart v. UMWA 1974 Pension Trust, 5 F.3d 74,

77 (4th Cir. 1993).

There are compelling reasons for the deferential

standard of review, not the least of which is that it "'ensure[s]

that administrative responsibility rests with those whose

experience is daily and continual, not with judges whose exposure

is episodic and occasional.'"  Brogan v. Holland, 105 F.3d 158,

164 (4th Cir. 1997); Johannssen, 292 F.3d at 169.  As noted by

the court of appeals in Brogan, no abuse is present if the

decision "'is the result of a deliberate, principled reasoning

18

process and if it is supported by substantial evidence.'" <u>Brogan</u>,
105 F.3d at 161 (quoted authority omitted).  <u>Lockhart</u> similarly
noted the "dispositive principle remains . . . that where plan
fiduciaries have offered a reasonable interpretation of disputed
provisions, courts may not replace it with an interpretation of
their own."  <u>Id.</u> at 77.

The Plan confers full discretionary authority on Unum
to determine eligibility for benefits and interpretation of
terms.  Specifically, the Plan provides that, "When making a
benefit determination under the Summary of Benefits, Unum has
discretionary authority to determine your eligibility for
benefits and to interpret the terms and provisions of the Summary
of Benefits."  (AR at UASP10026).

As noted, however, when applying a deferential standard
the court may take into account conflicts of interest that arise
because of the administrator's dual role as the overseer of
benefit awards and as the insurer of the Plan.  The
Administrative Record establishes Unum pays awarded benefits out
of its own assets:  "Benefits are administered by the insurer[.]
The Plan is funded as an insured plan . . . issued by Unum."  (<u>Id.</u>
at UASP10056).  Unum is thus both the arbiter and the insurer of
benefits.  This creates a conflict of interest, which the court

will take into account by applying a modified abuse of discretion standard.

B.    Whether the Denial of Benefits Constituted an Abuse of
      Discretion Under the Modified Standard

      The court notes initially that it is Rutledge's burden to demonstrate her entitlement to benefits.  <u>Ruttenberg v. U.S. Life Ins. Co.</u>, 413 F.3d 652, 663 (7th Cir. 2005) (cited in <u>Donnell v. Metropolitan Life Ins. Co.</u>, No. 04-2340, slip op. at *4 n.9, 2006 WL 297314 (4th Cir. Feb. 8, 2006)).

      Although the court has considered each of the eight <u>Booth</u> factors that appear relevant, the factors concerning 1) the language of the plan, 2) the adequacy of the materials considered and the degree to which the materials support the decision, and 3) the fiduciary's motives and any conflict of interest it may have, are the subject of most controversy between the parties. Each of those factors is considered in turn.

      First, Unum's determinations were based on the Plan's language.  The Plan states, "The benefit will be paid only if an accidental bodily injury results in one or more of the covered losses listed below within 365 days from the accident." (AR at

UACL10050).  The Plan defines "Accidental Bodily Injury" as "bodily harm caused solely by external, violent and accidental means and not contributed to by any other cause." (<u>Id.</u> at UACL10062).  This sole cause provision is fortified by express language in the Plan excluding "accidental losses caused by, contributed to by, or resulting from . . . disease of the body." (<u>Id.</u> at UACL10053).  These provisions were relied upon by Unum in denying the claim.

Rutledge contends the loss of her legs was covered under the Plan because it resulted from an accidental bodily injury.  This argument rests on authority construing "sole cause" clauses in insurance policies wherein such provisions limit covered losses to those caused "directly and independently of all other causes."  <u>Adkins v. Reliance Standard Life Ins. Co.</u>, 917 F.2d 794, 795 (4th Cir. 1990).

In the context of ERISA claims involving <u>de</u> <u>novo</u> review of claim denial, our court of appeals has held a contributing cause must "substantially" contribute to the loss to defeat coverage under a sole cause clause.  <u>Quesinberry v. Life Ins. Co. Of Am.</u>, 987 F.2d 1017, 1027-28 (4th Cir. 1993); <u>Reliance Standard</u>, 917 F.2d at 795, 797.

The rule from Reliance Standard, commonly known as the "Reliance Standard test" has been subsequently upheld and applied by our court of appeals.  Quesinberry, 987 F.2d at 1027-28.  The two-pronged test examines whether a preexisting illness or predisposition defeats accidental injury or death coverage, inquiring: 1) whether there is a preexisting disease and 2) whether this preexisting disease "substantially" contributed to the loss.  Id.

In this regard, the plaintiff acknowledges that "as to the right leg, arguably, the reports do establish that Kathy's preexisting infirmity was a substantial cause."  (Pl.'s Mot. at 22).  However, Rutledge argues that as to the left leg "the evidence suggests that it [the preexisting infirmity] was merely 'a cause,' not 'the cause,' or a 'significant cause.'" (Id.) Unum's actual determination was that Rutledge's preexisting disease was "a contributing cause" of the left leg amputation. Under the terms of the Plan, that is sufficient to deny coverage.

Rutledge fails to acknowledge that the Plan had an "exclusionary" clause, specifically excluding "accidental losses caused by, contributed to by, or resulting from . . . disease of the body," in addition to a "sole cause" provision.  In both Reliance Standard and Quesinberry, the court was examining plan

language that contained a sole cause provision which, the court
concluded, required the preexisting condition to "substantially"
contribute to the loss.  Noticeably absent from the cited
authority is consideration of an exclusionary clause similar to
the Plan language here.[4]

Rutledge's authority is inapplicable as well because
review of Unum's denial of her claim is subject to a modified
abuse of discretion rubric only, while the cases cited by
Rutledge involved <u>de</u> <u>novo</u> review.  It is not the role of the
court to rewrite the Plan when the duly authorized claims
reviewing fiduciary has offered a reasonable interpretation of
the governing provisions.

As noted, the Plan conferred discretion on Unum to
interpret its terms.  To repeat, "Accidental Bodily Injury" is
defined by the Plan as bodily harm caused solely by external,
violent and accidental means and not contributed to by any other
cause.  Correspondingly, the Plan's exclusionary clause expressly
excludes accidental losses caused by, contributed to by, or
resulting from disease of the body.  Rutledge's interpretation

_____

[4] <u>Reliance Standard</u> made reference to a similar exclusionary
clause to that found here.  The court of appeals stated though
that the clause "is not now at issue in this case."  <u>Reliance
Standard</u>, 917 F.2d at 796.

23

would require the court to deviate from the plain language of the Plan and specifically require the disease of the body to "substantially" or "significantly" contribute to the loss for coverage to be denied.

Because the medical evidence showed that the loss of each of Rutledge's limbs was either caused by or contributed to by antiphospholipid antibody syndrome (a disease of the body), Unum determined that she was not entitled to benefits under the Plan's terms.  (Id. at UACL00953-51, UACL01037-35).  Rutledge does not dispute that the syndrome is a cause or contributing factor of the amputations.  She instead challenges only the significance the syndrome should be given.  Based on the wording of the Plan, Unum reasonably decided to apply the Plan as written.

Second, the materials obtained by Unum and supplemented by the plaintiff were adequate and support Unum's decision.  The plaintiff told Unum in her initial telephone call that the accident that resulted in the amputation occurred when she was eight years old.  After plaintiff's counsel represented that the accident occurred in December of 2002, Unum opened a file on the claim and began to review the medical evidence.

The Administrative Record shows that Unum requested and received numerous medical records.  The on-site RN reviewed the records, discussed the various physician visits and hospital stays, described the medical procedures, and reported her findings.  The RN's report was then reviewed by an on-site forensic pathologist, who agreed with the RN's conclusions.  The medical professionals concurred that antiphospholipid antibody syndrome is a disease of the body.

In connection with the plaintiff's appeal, she was permitted to submit additional medical information, which was referred to the forensic pathologist.  The pathologist concluded that the newly submitted documentation included nothing to show that the amputations were not contributed to by a disease of the body.

Third, the record does not show that Unum's denial was motivated by an unseemly profit motive.  Unum followed the Plan's claims review and appeal procedures.  There is no evidence presented by the plaintiff that Unum's adverse benefit determination resulted from anything other than a reasoned application of the Plan's terms to the available medical evidence.

Even after appropriate adjustment of the fully deferential standard, none of the relevant <u>Booth</u> factors point to the conclusion that Unum abused its discretion in denying the plaintiff's claim for long-term disability benefits.  After examining the case with deference lessened to the degree necessary to neutralize any conflict of interest, the court finds the defendants, who engaged in a reasoned and principled decision making process, are entitled to summary judgment.

The court, accordingly, ORDERS that plaintiff's motion for summary judgment be, and it hereby is, denied.  The court further ORDERS that the defendants' motion for summary judgment be, and it hereby is, granted.  It is additionally ORDERED that this civil action be, and it hereby is, dismissed with prejudice and stricken from the docket.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED: December 6, 2006

John T. Copenhaver, Jr.
United States District Judge

26